UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
OWENSBORO DIVISION

VAL SMITH AND GWEN SMITH,                                    Plaintiffs

v.                                        Civil Action No. 4:24-cv-0079-RGJ

AMERICAN STRATEGIC INSURANCE                                 Defendant
CORP

* * * * *

**MEMORANDUM OPINION & ORDER**

Plaintiffs Val Smith and Gwen Smith ("Plaintiffs") bring claims for breach of contract and bad faith under the common law the Kentucky Unfair Claims Settlement Practices Act ("UCSPA"). [DE 6]. Defendant, American Strategic Insurance Corp ("ASIC"), moves for summary judgment on all of Plaintiff's claims. [DE 36]. Plaintiffs responded [DE 44] and ASIC replied [DE 49]. Also before the Courts are ASIC's and Plaintiffs' motions to exclude expert witnesses. [DE 37; DE 38; DE 39]. The parties have fully briefed these motions. [*See* DE 41; DE 45; DE 43; DE 46; DE 42; DE 47]. These matters are ripe. For the reasons below, ASIC's motion to exclude the proposed opinion testimony of Gaston and Garrigan [DE 37] is **DENIED**, Plaintiffs' motions to exclude the testimony of Meeks [DE 38] and Smith [DE 39] are **DENIED**, and ASIC's Motion for Summary Judgment [DE 36] is **GRANTED in part and DENIED in part**.

## I.    BACKGROUND

Plaintiffs purchased their home at 496 Southwood Drive, Madisonville, KY, in May 2017 (the "Property"). [DE 6]. Before closing, Plaintiffs hired American Building Science ("ABS") to inspect the Property. [DE 36 at 457]. The inspector reported "significant deficiencies and maintenance items that need[ed] further evaluation or repair by appropriately Licensed

1

Contractors," and noted "multiple areas of cracking and attempted repairs or patching" to the Property's exterior, including the "asphalt driveway, masonry, exterior foundation, retaining walls, exterior windows, brick and vinyl siding," garage, and roof. [*Id.* (citing DE 36-4)]. However, Plaintiffs do not recall observing significant damage to the Property or discussing the issues identified in the report among themselves or with their realtor before purchasing the Property. [DE 44 at 4961].

After taking possession of the Property, Plaintiffs observed "cracking, ceilings coming apart, fixing it and then coming right back, so we were just concerned." [*Id.*]. Plaintiffs filed a claim with their home insurer at the time, Kentucky Farm Bureau Mutual Insurance Company ("KFB"), on September 19, 2017. [*Id.*]. On September 26, 2017, KFB conducted a visual inspection of the Smiths' home and recorded an interview with Val Smith. [DE 36 at 459]. The visual inspection by KFB documented similar damages to the ABS inspection report, including significant cracking to the exterior and interior of the Property. [DE  36-7]. KFB hired Bowser-Morner, an engineering firm, to determine the cause of the structural damage to the Property. [*Id.*].

Ultimately, Bowser-Morner determined that the damages were caused by "natural soil movement due to the conditions present at the home affecting the footings and foundation walls of the house." [*Id. See also* DE 36 at 461 ("Based on their investigation, the Bowser-Morner experts concluded that "the primary cause and origin of the damages presently occurring in the residence is natural soil movement due to conditions present at the site affecting the footings and foundation walls of the house."")]. KFB denied the claim. [DE 36-10].

Plaintiffs switched insurers in 2018, and on July 15, 2020, entered into a new homeowners' policy with ASIC. [DE 36 at 462]. When applying for the claim, Plaintiffs' broker did not report Plaintiffs' KFB claim to ASIC. [*Id.*]. ASIC issued policy number KYA36065 to Plaintiffs, for a

2

policy period extending from July 15, 2020, to July 15, 2021, insuring covered losses to the Property (the "Policy"). [DE 9-1]. The Policy excluded "direct and accidental physical loss[es]" due to "Earth Movement," defined as "any sinking, rising, shifting, expansion or contraction of earth, whether the cause is natural or not," as well as exclusions for "Existing Damages," or

> 1. Damages which occurred prior to policy inception regardless of whether such damages were apparent at the time of the inception of this policy or discovered at a later date; or
> 2. Claims or damages arising out of workmanship, repairs or lack of repairs arising from damage which occurred prior to policy inception.

[*Id.* at 175]. As required by Kentucky Law, the Policy excepted from the Earth Movement exclusion damages caused by "Mine subsidence," defined as "the collapse of underground coal mines resulting in direct damage to a 'structure'." [*Id.* at 195].

On April 15, 2021, Plaintiffs filed a second claim, this time to ASIC, reporting that their home had suffered damages caused by "coal mine subsidence." [DE 6 ¶ 12]. ASIC engaged NV5, a technical engineering consulting firm, to determine the cause and origin of the reported structural damages to the Property. [DE 36 at 465]. NV5 assigned a professional geologist, Norman Meeks ("Meeks"), and a professional engineer, Thomas Smith ("Smith"), to conduct the investigation. [*Id.*] ASIC also hired an independent field adjuster, Rusty Neeper, with Lighthouse Claims Service, to document the existing damages to the Property. [*Id.* at 466]. Mr. Neeper's report stated that "[i]t appears the cause of this loss is said to be Mine Subsidence." [*Id.*]. However, NV5 determined that "[m]ine subsidence was not the cause of the documented damage." [*Id.*]. Following NV5's report, ASIC denied Plaintiffs' claim by letter dated July 5, 2021. [DE 36-14].

On the advice of Meeks, Plaintiffs made complaints to the Kentucky Environmental and Energy Cabinet's Division of Abandoned Mine Lands Reclamation ("AML"), a state entity tasked with, *inter alia*, "abat[ing] problems caused by historic coal mining," including subsidence due to

abandoned coal mines. [*See generally* DE 36 at 466; DE 44 at 4963]. On June 20, 2021, an inspector from AML visited the Property and confirmed "exterior/interior cracks, movement, and homeowner reports of popping/cracking noises." [DE 44 at 4964]. Plaintiffs continued making complaints to AML as damage to the Property worsened, resulting in subsequent inspections in September and December of 2022. [*Id.* at 4964–65].

On January 6, 2023, the Kentucky AML determined that Plaintiffs qualified for funding and ultimately conducted the "Gwen Smith Subsidence AML Reclamation Project." [*Id.* at 4965–71; *see also* DE 44-6]. AML observed that two coal seams in the vicinity of the Property, "Western Kentucky No. 11" and "Western Kentucky No. 9," were undermined by coal companies and indicated that significant damage to the Property was "caused by subsidence." [DE 36-22 at 976]. To rectify the subsidence, AML proposed "drilling and pressure grouting holes around the property to fill the voids underground" caused by subsidence. [*Id.*]. AML began the project in early 2023 and concluded in April 2024, at a cost of approximately $1.8 million. [DE 44 at 4971].

In January 2024, Plaintiffs petitioned ASIC to reopen their claim for mine subsidence. [*Id.* at 4972]. ASIC again contracted NV5 to investigate the claim. [DE 36 at 471]. NV5 "issued open records requests to [AML] to fully investigate the new materials." [*Id.*]. NV5 submitted a supplemental report to ASIC, concluding that "[b]ased on the information available to NV5 at the time . . . it remains the opinion of NV5 that the [Property] did not experience mine subsidence" as defined by the Policy. [*Id.* citing (DE 6-1)]. Mr. Neeper also conducted a loss documentation investigation at the Property, during which Plaintiffs assert he opined that the damages looked consistent with his experience documenting mine subsidence losses. [DE 4973]. On February 16, 2024, ASIC reaffirmed its denial of Plaintiffs' claim, "explaining that NV5 had completed its

4

review of the additional information, but there was still no evidence that the damages to their home were caused by mine subsidence during the Policy period." [DE 36 at 472 (citing DE 36-30)].

Plaintiffs brought this action against ASIC alleging Breach of Contract (Count I), Violations of the Kentucky Unfair Claims Settlement Practices Act ("UCSPA") (Ky. Rev. Stat. § 304.12-230) (Count II), Common Law Bad Faith (Count III), Negligence (Count IV), and Violations of Ky. Rev. Stat. § 304.12-235 (Count V). [DE 6]. On January 23, 2026, Plaintiffs disclosed the expert reports of their causation witness, Harold Gaston ("Gaston"), as well as the damages opinion testimony of David Garrigan ("Garrigan"). [DE 29]. ASIC disclosed the causation opinion testimony of Norman Meeks ("Meeks") and Thomas Smith ("Smith") to Plaintiffs on February 23, 2026. [DE 36 at 473].

ASIC now moves for summary judgment on all counts. [DE 36]. Both parties move to exclude the testimony of the opposing party's expert(s). [DE 37; DE 38; DE 39].

## II.    ANALYSIS

Because the outcomes of the parties' motions to exclude [DE 37; DE 38; DE 39] have bearing on ASIC's Motion for Summary Judgment [DE 36], the Court addresses the expert motions first.

### A.  Expert Motions

#### 1.  *Standard*

The admissibility of expert testimony is set forth in Federal Rule of Evidence 702, which provides :

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>> (b) the testimony is based on sufficient facts or data;

5

(c) the testimony is the product of reliable principles and methods; and
(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

In *Daubert v. Merrell Dow Pharm., Inc.*, "the Supreme Court established a general gatekeeping obligation for trial courts to exclude from trial expert testimony that is unreliable and irrelevant." *Conwood Co. v. U.S. Tobacco Co.*, 290 F.3d 768, 792 (6th Cir. 2002) (alteration and internal quotation marks omitted); *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149 (1999) (holding *Daubert* analysis applies to expert testimony based on "technical" or "specialized knowledge").

> Under Rule 702 of the Federal Rules of Evidence, "a proposed expert's opinion is admissible . . . if the opinion satisfies three requirements. First, the witness must be qualified by 'knowledge, skill, experience, training, or education.' Second, the testimony must be relevant, meaning that it 'will assist the trier of fact to understand the evidence or to determine a fact in issue.' Third, the testimony must be reliable."

*Burgett v. Troy-Bilt LLC*, 579 F. App'x 372, 376 (6th Cir. 2014) (quoting *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 528-29 (6th Cir. 2008)).

The Court does "not consider 'the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question.'" *Id.* (quoting *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994)). The Court must determine whether the witness is qualified to offer an opinion on the specific area of expertise. *In re Welding Fume Prods. Liab. Litig.*, No. 1:03-CV-17000, 2005 WL 1868046, at * 33 (N.D. Ohio Aug. 8, 2005) ("An expert may be highly qualified to respond to certain questions and to offer certain opinions, but insufficiently qualified to respond to other, related questions, or to opine about other areas of knowledge."). Further,

> the only thing a court should be concerned with in determining the qualifications of an expert is whether the expert's knowledge of the subject matter is such that his

6

opinion will likely assist the trier of fact in arriving at the truth.  The weight of the expert's testimony must be for the trier of fact."

*Mannino v. International Mfg. Co.*, 650 F.2d 846, 851 (6th Cir. 1981).

Along with expert qualifications, "[t]he Court must determine whether evidence proffered under Rule 702 'both rests on a reliable foundation and is relevant to the task at hand.'" *Powell v. Tosh*, 942 F. Supp. 2d 678, 686 (W.D. Ky. 2013) (quoting *Daubert*, 509 U.S. at 597). To assist with this determination, the Supreme Court in *Daubert* laid out several factors[1] for the courts to consider.  *Daubert*, 509 U.S. at 592–594. Courts have "stressed, however, that *Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case. . . . In some cases . . . the factors may be pertinent, while in other cases the relevant reliability concerns may focus upon personal knowledge or experience." *First Tennessee Bank Nat. Ass'n v. Barreto*, 268 F.3d 319, 335 (6th Cir. 2001) (citation and internal quotation marks omitted) (finding that the *Daubert* factors "unhelpful" in a case involving "expert testimony derived largely from [expert's] own practical experiences throughout forty years in the banking industry [because] [o]pinions formed in such a manner do not easily lend themselves to scholarly review or to traditional scientific evaluation"). "[W]hether *Daubert*'s specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine." *Id.* (alteration in original) (quoting *Kumho Tire Co.,* 526 U.S. at 153).

Unlike lay witnesses, expert witnesses are not required to have personal, firsthand knowledge of the matter to which they testify. Instead, Rule 703 allows an expert to base their

---

[1] The *Daubert* factors include "[w]hether a 'theory or technique . . . can be (and has been) tested'; [w]hether it 'has been subjected to peer review and publication'; [w]hether, in respect to a particular technique, there is a high 'known or potential rate of error' and whether there are 'standards controlling the technique's operation'; and [w]hether the theory or technique enjoys 'general acceptance' within a 'relevant scientific community.'" *Kumho*, 526 U.S. at 149–50 (quoting *Daubert*, 509 U.S. at 592–594).

opinions on "facts or data" of any type, so long as experts in the particular field would reasonably rely on those kinds of facts or data in forming opinions on the subject. Fed. R. Evid. 703.

Decisions on admissibility of expert testimony are reviewed subject to the abuse-of-discretion standard. *Hardyman v. Norfolk & W. Ry. Co.*, 243 F.3d 255, 258 (6th Cir. 2001).

Under Fed. R. Civ. P. 26(a)(2)(B) retained expert witnesses are required to produce a written report stating the opinions they intend to express, the basis for those opinions, the facts or data considered in forming them, and any exhibits used to support them. To be sufficient, an expert opinion must not only "set forth facts" but, "in doing so, [must] outline a line of reasoning arising from a logical foundation." *Brainard v. Am. Skandia Life Assur. Corp.*, 432 F.3d 655, 664 (6th Cir. 2005); *see also R.C. Olmstead, Inc., v. CU Interface, LLC*, 606 F.3d 262, 271 (6th Cir. 2010) ("Expert reports must include 'how' and 'why' the expert reached a particular result, not merely the expert's conclusory opinions.") (citation omitted).  The parties are under a continuing duty to supplement those expert reports in accordance with Rule 26(a)(2)(E). Fed. R. Civ. P. 26(a)(2)(E). Rule 37(c)(1) requires exclusion of witnesses and evidence not disclosed in accordance with Fed. R. Civ. P. 26(a) or (e) unless the party can show that the failure to timely disclose was "substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).

When an expert testifies at a deposition in conjunction with their report, the disclosure requirement "presents a more nuanced issue." *Crouch v. Honeywell Int'l, Inc.*, No. 3:07-CV-638-DJH, 2015 WL 13547448, at *5 (W.D. Ky. Nov. 19, 2015). Rule 26(b)(4)(A) permits the deposition of a person identified as an expert to be taken after the report has been served. Indeed, "[t]he reason for requiring that an expert report be provided before a deposition is taken is so the opposing party can use the report to examine the expert at the deposition." *Walter Int'l Prods., Inc. v. Salinas*, 650 F.3d 1402, 1413 (11th Cir. 2011). Additionally, the expert may expound on his or

her opinions during the deposition. *See Thompson v. Doane Pet Care Co.*, 470 F.3d 1201, 1203 (6th Cir. 2006) ("The rule contemplates that the expert will supplement, elaborate upon, explain and subject himself to cross-examination upon his report."). However, deposition testimony of an expert will not, as a general rule, cure a deficient expert report. *See Crouch,* 2015 WL 13547448, at *5 (quoting *Ciomber v. Coop. Plus, Inc.*, 527 F.3d 635, 642 (7th Cir. 2008) ("Rule 26(a)(2) does not allow parties to cure deficient expert reports by supplementing them with later deposition testimony.")).

### 2.  *ASIC's Motion to Exclude Gaston and Garrigan*

ASIC moves to exclude Gaston's causation opinions "because they are based on a visual inspection, unsupported anecdotal observations, and incomplete, litigation-driven materials rather than sufficient facts, reliable principles, or any discernible methodology." [DE 37 at 1361]. Although it appears that Gaston elaborated on his opinions and the bases for those opinions in detail at his deposition, ASIC contends that Plaintiffs failed to satisfy the disclosure requirements under Rule 26(a)(2)(B), and thus Gaston's opinions are unreliable and irrelevant under Rules 702 and 703. [*Id.* at 1371]. Because Garrigan's opinions are "derivative of Gaston's," ASIC argues they must be excluded as well. [*Id.* at 1361].

### i.  Whether Gaston's Disclosures Satisfy Rule 26

On January 23, 2026, Plaintiffs filed the expert reports of Gaston and Garrigan. [DE 29]. Gaston's expert opinions were disclosed in two letters, dated November 14, 2025 and January 23, 2026. [See DE 29-1; DE 29-2]. The November 2025 letter provides Gaston's opinion that the Property was damaged due to coal mine subsidence, while the January 2026 letter incorporates Garrigan's calculation of the cost to repair the Property and provides a corresponding estimate of the damages caused by the mine subsidence. [*Id.*].

The November 2025 letter states that Gaston's causation opinion relied on three categories of data or information: (1) a "visual inspection" of the Property; (2) "knowledge of the area, coupled with years of experience investigating structural issues with residential and commercial buildings"; and (3) "the deposition of Lynn Mayhew, Supervisor of the [AML]" and "the exhibits attached to the deposition of Mr. Mayhew." [DE 29-1 at 349].

However, the day before Gaston was deposed, Plaintiffs produced additional "reliance materials that were not identified in, referenced by, or previously produced with either witness's report." [DE 45 at 7402 (citing DE 41-9)]. According to ASIC,

> The link for Gaston's 'reliance materials' included more than 1,100 pages of materials, including a 1929 textbook on mining subsidence; excerpts from various journal articles; a chapter on mining subsidence from another unidentified textbook; a 184-page study conducted by the U.S. Department of the Interior in 1984 titled 'Madisonville Areawide Subsidence Investigation;' and 534 pages from a 1996 textbook titled 'Soil Mechanics in Engineering Practice.' . . . Likewise, the link for Garrigan contained a chapter out of a textbook titled 'Architectural Graphic Standards,' a list of building codes, and a previously unprovided document titled 'Estimate' that gave an itemized list of the cost for proposed repairs at the plaintiffs' home.

[*Id.* at 7402–03]. And at Gaston's deposition, ASIC claims that he stated he relied on "previously undisclosed facts and data," to support his causation opinions. [DE 37 at 1373].

> For example, he testified that he relied on a coal mine study for the Madisonville area in forming his opinions. . . . He testified that he analyzed the effects of the width and number of mine rooms and pillars below the plaintiffs' home, calculated the percentage of the home over a pillar versus a room, and the impact he believes that had on the plaintiffs' home in forming his opinions. . . . He also testified that he plans to offer opinions related to his analysis of what he called the 'exploratory drill hole information' (core samples taken by Associated Engineers) and photos of those core samples that he claims to have received from an open records request to the AML and how they support his contention that there was mine subsidence at this location.

[*Id.* at 1373].

ASIC does not dispute that Gaston's opinions and the bases for them were ultimately disclosed through his letters, the reliance materials, and his deposition testimony. Rather, ASIC argues that Gaston's expert disclosures, the November 2025 and January 2026 letters, were not themselves enough to satisfy the disclosure requirements of Rule 26(a)(2)(B). Plaintiffs argue that Gaston's letters satisfied the disclosure requirements of Rule 26(a)(2)(B), but that even if they did not, the late disclosure of the reliance materials does not warrant exclusion under Rule 37. [*See generally* DE 41].

Here, Gaston was deposed regarding the opinions in his report and the materials he relied upon. Thus, "the disclosure requirement presents a more nuanced issue." *Crouch*, 2015 WL 13547448, at *5 (citation modified). As explained by the Sixth Circuit, Rule 26 "contemplates that the expert will supplement, elaborate upon, explain and subject himself to cross-examination upon his report." *Thompson*, 470 F.3d at 1203. While Rule 26(a) seeks to prevent "ambush at trial" and to "shorten or decrease the need for expert deposition," *R.C. Olmstead, Inc.*, 606 F.3d 262, 271 (6th Cir. 2010), district courts in this Circuit have found that "those concerns can become moot when a deposition is actually taken." *United States v. Roberts*, 830 F.Supp.2d 372, 387 (M.D. Tenn. 2011) (citing *E.E.O.C. v. Freemen*, 626 F.Supp.2d 811, 821 M.D. Tenn. 2009)). *But see Ciomber*, 527 F.3d at 642 (Seventh Circuit holding "Rule 26(a)(2) does not allow parties to cure deficient expert reports by supplementing them with later deposition testimony.").

Accordingly, the Court first considers whether, at his deposition, Gaston was merely "supplement[ing], elaborate[ing] upon, [and] explain[ing]" the opinions and the bases for them disclosed in his November 2025 and January 2026 letters, such that ASIC was given adequate notice. *Thompson*, 470 F.3d at 1203.

After review of the record, the Cout finds that Gaston's deposition testimony was within the scope of opinions expressed in his expert report(s). Gaston's November 2025 letter states that he "studied the mine working maps when the project was ongoing and am aware of the mining underneath the Smith house; the voids left therein; and the Kentucky AML project to pump concrete (grout) underneath the Smith house." [DE 29-1 at 350]. He explained that he "agree[d] with the findings of [AML], as outlined in the deposition of Lynn Mayhew, that the Smith residence has been materially damaged as outlined herein due to coal mine subsidence." [*Id.*]. Gaston's deposition testimony that he "analyzed the effects of the width and number of mine rooms and pillars below the plaintiffs' home," and that he considered the core samples from AML are fairly within the scope of his expert report(s). Similarly, Gaston's deposition testimony that he "relied on a coal mine study for the Madisonville area in forming his opinions," [DE 37 at 1373], is consistent with the statement in his report that he relied on his experience and "knowledge of the area." [DE 29-1 at 349]. And Gaston's resumé reflects that the bulk of his engineering experience has taken place in the city of Madisonville, Kentucky. [DE 29-3 at 430].

On the other hand, ASIC's complaint that the Plaintiffs did not actually disclose the materials Gaston relied on to form his opinions until the day before his deposition is well taken. "There is no doubt that Rule 26 requires an expert witness to produce all the materials on which he relies to reach his conclusion." *Marathon Petroleum Co. LP v. Midwest Marine, Inc.*, No. 09-13804, 2012 WL 6632474, at *5 (E.D. Mich. Dec. 17, 2012); *see also Won v. Gen. Motors, LLC*, No. 19-11044, 2022 WL 3010886, at *16 (E.D. Mich. July 28, 2022) ("Of course, it is undisputed that all information relied upon by an expert in formulating his opinion must be disclosed *along with his report*.") (emphasis added).

12

The Court therefore must consider whether this violation was "harmless or is substantially justified." *R.C. Olmstead*, 606 F.3d at 271–72 (citing *Roberts v. Galen of Virginia, Inc.*, 325 F.3d 776, 782 (6th Cir. 2003)). The Sixth Circuit considers five factors in determining whether a non-compliant disclosure was substantially justified or harmless, including: the surprise to the party against whom the evidence would be offered; the ability of that party to cure the surprise; the extent to which allowing the evidence would disrupt the trial; the importance of the evidence; and the nondisclosing party's explanation for its failure to disclose the evidence. *Howe v. City of Akron*, 801 F.3d 718, 748 (6th Cir. 2015) (quoting *Russell v. Absolute Collection Servs., Inc.*, 763 F.3d 385, 396-97 (4th Cir. 2014)).

Here, the majority of the *Howe* factor weigh against sanctions. ASIC has not shown it was prejudiced by this late disclosure. As discussed above, the testimony Gaston intends to give at trial appears to be within the scope of the opinions disclosed in his report. There is no apparent risk that if Gaston testifies at trial, ASIC will be surprised by his testimony. Nor, as a result, is there a substantial likelihood that allowing Gaston's testimony would disrupt trial. As for the ability to cure the violation, to the extent ASIC believes that it was prejudiced by Plaintiffs' late disclosure, ASIC may move to compel additional discovery—but ASIC has not done so here or explained what additional information it might seek and so the Court will not order further discovery at this time. While Plaintiffs have offered no explanation for their untimely disclosure, the weight of the *Howe* factors compel the Court to conclude that the violation was harmless. Notably, the reliance materials did not change the nature of Gaston's testimony or the conclusions that he ultimately reached. Thus, the Court declines ASIC's request to impose Rule 37's exclusionary remedy.

      ii.    Whether Gaston's Opinions Satisfy Rule 702

13

Next, ASIC contends that Gaston's opinions, and by extension, Garrigan's, do not "meet Rule 702's requirements of reliability and relevance." [DE 37 at 1375]. The majority of ASIC's arguments presume that the admissibility of Gaston's testimony is determined by the content of his report alone. [*See* DE 45 at 7413 (arguing that "Gaston's *report* does not contain adequate facts upon which he based his conclusion [or] . . . . any methodology or testing upon which he based those conclusions") (emphasis added)]. But courts recognize that the admissibility of an expert's testimony under Rule 702 and the disclosure requirements under Rule 26 present separate standards. *Burke v. U-Haul Int'l*, No. CIV.A. 3:03CV32H, 2004 WL 5499520, at \*12 (W.D. Ky. Dec. 7, 2004) ("[W]hile Rule 26(a)(2)(B) requires a complete statement of all opinions to be expressed and the basis and reasons therefore, . . . it does not require that a report [disclose all] information that might be elicited on direct examination to establish the admissibility of the expert opinion under *Daubert*."). In other words, the Court looks not only at Gaston's report but also to the other record evidence of the methodology and data he relied on to determine the admissibility of his opinions.

Here, Gaston testified that he based his opinions on, among other things, "[c]ore samples from the AML investigation showing fractured and broken strata" from underneath the land on which the Property is located, the "presence of a large mine void" beneath the Property in relation to its location, and the "pattern and extent of structural damage." [DE 41 at 3199–200 (summarizing deposition testimony)]. Based on this data and his experience in similar cases, Gaston concluded that the damages to the Property were the result of mine subsidence and not soil or water issues alone." [*Id.*]. ASIC has not explained how Gaston's reliance on core samples, for example, is unreliable, given that the record shows it is also the methodology employed by AML to determine the presence of a mine subsidence issue. Nor has ASIC shown that any of the other

data relied on by Gaston, such as the results of his visual inspection of the Property, are not of the type that other "experts . . . would reasonably rely on." Fed. R. Evid. 703. *See also Daubert*, 509 U.S. at 591–92; *Kumho*, 526 U.S. at 147; *Pride v. BIC Corp.*, 218 F.3d 566, 577 (6th Cir. 2000).

ASIC's remaining arguments go to the weight of Gaston's testimony, but do not render Gaston's testimony inadmissible. For example, one of the "red flags" ASIC identifies is Gaston's failure to rule out "alternative explanations, including the significant pre-existing deficiencies documented in 2017." [DE 37 at 1377]. While the jury may choose to consider this gap in Gaston's analysis when evaluating the accuracy of his conclusion, courts routinely hold that "experts need not rule out every conceivable alternative cause." *In re Flint Water Cases*, No. 17-10164, 2021 WL 5847102, at *11 (E.D. Mich. Dec. 9, 2021) (citation modified). "To the contrary, the fact that several possible causes might remain unelimininated only goes to the accuracy of the conclusion, not to the soundness of the methodology." *Id.*

ASIC's final contention that "Gaston's opinions . . . would not assist the trier of fact" also fails. [DE 37 at 1378]. Essentially, ASIC argues that because Gaston cannot distinguish between damage documented at the Property before Plaintiffs purchased the Property or prior to the Policy period, his opinion would be unhelpful to the jury in determining causation. ASIC is correct that Gaston's testimony is limited to "whether or not mine subsidence had" occurred and whether it had "affected the [Property]." [DE 37 at 1379–80 (citing DE 37-3)]. And because nothing in the record shows that Gaston determined when the alleged damage to the Property occurred, it is true that Gaston's testimony does not resolve the ultimate coverage issue. However, Gaston's testimony does address the threshold issue of whether the damage to the Property is of the type that the Policy covers—i.e., whether it was caused by mine subsidence or other excluded causes, such as earth movement. As a result, the relevancy requirement of Rule 702 is satisfied.

15

###### iii.    ASIC's Objections to Garrigan's Opinions

Garrigan is Plaintiff's damages expert. Garrigan is a "contractor with approximately 28 years of experience in residential construction, including building over 20 houses and completing more than 100 renovations." [DE 41 at 3200]. Garrigan was retained by Gaston to provide a repair estimate for the Property. Garrigan produced the following "Scope of Work" report outlining a proposed project to repair the Property, along with the estimated costs:

> This Scope of Work defines the full house repair of a single-family residence due to what the engineer determines to be min[e] subsidence . . . . The project encompasses comprehensive interior and exterior remodeling including demolition, **foundation repair with 42 helical piers**, structural repairs, complete mechanical system upgrades, and interior finishes throughout [the Property].

[DE 29-2 at 418 (emphasis in original)]. Garrigan projected a total cost of "$523,746.55." [*Id.*].

As with Gaston, ASIC moves to exclude Garrigan on the basis that his report failed to satisfy Rule 26's disclosure requirements and because "Garrigan's opinions independently fail each requirement of Rule 702."[2] [DE 37 at 1379].

With respect to ASIC's request to exclude Garrigan's opinions under Rule 37, although Garrigan's "Scope of Work" letter was deficient under Rule 26, the Court finds that the *Howe* factors weigh against exclusion of his testimony for the same reasons as discussed above for Gaston. Notwithstanding the failure of Garrigan's "report" to disclose his "basis or reasons," the "facts or data [he] considered, or" his "methodology," [*id.* at 1373], ASIC was able to discover this information at Garrigan's deposition. ASIC learned that Garrigan visited the Property with Gaston and based his report on that visual inspection, [DE 41-5 at 4551], along with his "experience as a professional," [*id.* at 4561], knowledge of the "Kentucky Building Code," [*id.* at

---

[2] To the extent ASIC argues that Gaston must be excluded because his "'opinions' are derivative of Gaston's," [DE 37 at 1362], this argument fails for the reasons explained herein. *See supra* Sections II.A.2.i–ii.

16

4556], as well as specific recommendations from Gaston with respect to the foundation, [*id.* at 4555]. Indeed, ASIC has failed to identify any information that it was unable to discover through Garrigan's deposition. As a result, the first three *Howe* factors—consideration of the surprise to ASIC, the ability of ASIC to cure that surprise, and the extent to which allowing Garrigan's testimony would disrupt trial—all militate against exclusion. *Howe*, 801 F.3d at 748.

Next, the Court considers ASIC's argument that Garrigan's testimony must be excluded under Rule 702. ASIC asserts that

> Garrigan is a contractor, not an engineer, geologist, or subsidence specialist. He conducted no testing, took no measurements, performed no structural analysis, and analyzed no subsurface investigation. His sole contribution is a repair estimate that assumes subsidence occurred because Gaston told him so. Because Garrigan offers no methodology and no analysis tied to the facts, his opinions would not assist the trier of fact and must therefore be excluded.

[DE 37 at 1361–62].

ASIC overstates the required qualifications and methodology for Garrigan's opinions in case. Garrigan's testimony in this case is limited to providing an estimate of repair costs for the damages Gaston attributes to mine subsidence. Garrigan need not be qualified as "an engineer, geologist, or subsidence specialist" [*id.* at 1379] to do so. Rather, Garrigan is entitled to rely on Gaston's opinions as to the cause of the observed damages, as well as the necessity of certain foundational repairs. *See Ohio Envt'l Dev. Ltd. P'ship v. Envirotest Sys. Corp.*, 478 F. Supp. 2d 963, 976 (N.D. Ohio 2007) ("[A]n expert's testimony may be formulated by the use of the facts, data and conclusions of other experts."); *Asad v. Cont'l Airlines, Inc.*, 314 F. Supp. 2d 726, 740–741 (N.D. Ohio 2004) (expert testimony admissible even though based on another expert's causation opinion)). Garrigan's "28 years of experience in residential construction," [DE 41 at 3200], including "at least 1,300 separate estimates for house repair," [DE 41-5 at 4582], qualify him to opine as to the estimated cost of repairing the damages to the Property. *See Wilson v. State*

*Farm Fire & Cas. Co.*, No. 3:09-CV-199, 2010 WL 11639841, at *3 (E.D. Tenn. Oct. 18, 2010) ("Contracting is a field in which experience is a predominant basis for an expertise."). ASIC fails to explain why an experienced home repair contractor would not have "knowledge of the subject matter . . . such that his opinion will likely assist the trier of fact in arriving at the truth." *Mannino*, 650 F.2d at 851.

Likewise, while ASIC alleges that Garrigan's "methodology amounted to walking around, making assumptions, and writing an estimate," ASIC has not explained how this methodology necessarily renders Garrigan's estimate unreliable. [DE 37 at 1380]. Garrigan's methodology is based on his "personal knowledge [and] experience" estimating the cost of residential repair projects, as well as the engineering opinions of Gaston and other reliance materials discussed at his deposition on which Garrigan's background knowledge of residential repair is based. *First Tennessee Bank Nat. Ass'n*, 268 F.3d at 335. [*See also* DE 41-5 at 4551]. Courts regularly admit damages testimony based on similar methodologies. *See, e.g., Adler v. Elk Glenn, LLC*, 986 F. Supp. 2d 851, 862 (E.D. Ky. 2013) (admitting testimony of expert witness, a home builder, that estimated the cost of repairing mine subsidence through "what he viewed as the most suitable repairs, based on his extensive experience as a contractor"). Garrigan's opinions therefore satisfy Rules 702 and 703.

Accordingly, ASIC's motion to exclude Gaston and Garrigan [DE 37] is **DENIED**.

### 3. *Plaintiffs' Motions to Exclude Meeks [DE 38] and Smith [DE 39]*

As discussed above, ASIC hired the consulting firm NV5 to investigate Plaintiffs' mine subsidence claims and NV5 twice concluded that there was "no evidence that the damages [the Property] were caused by mine subsidence during the Policy period." [DE 36 at 472 (citing DE

36-30)].  ASIC disclosed the co-authors the two NV5 reports concerning the Property, Meeks and Smith, as experts in this case.

      i.     Plaintiffs' Objections to Meeks Opinions

Plaintiffs move to exclude the testimony of Meeks pursuant to Rule 702. First, they argue that "Meeks is unqualified to offer his opinions in this case." [DE 38 at 1747]. Plaintiffs assert that Meeks experience as a "career geologist that works only for insurance companies, state and federal agencies, and hospitals" is insufficient because he lacks certain specialized experience with coal mine subsidence. [*Id.* at 1748].

This argument lacks merit. Rule 702 permits expert testimony from a witness qualified by "knowledge, skill, experience, training, or education," and the Sixth Circuit applies a liberal standard in assessing those qualifications. *See* Fed. R. Evid. 702. Courts in this circuit "take a liberal view of what 'knowledge, skill, experience, training, or education' is sufficient to satisfy the requirement.'" *Bradley v. Ameristep, Inc.*, 800 F.3d 205, 208-09 (6th Cir. 2015) (quoting *Pride v. BIC Corp.,* 218 F.3d 566, 577 (6th Cir. 2000)). Contrary to Plaintiffs' assertion, Meeks is not required to have previously "worked for individuals like the Smiths. . . .  given a deposition . . . . [or] written or published anything on coal mine subsidence" for him to be qualified to opine in this matter. [DE 38 at 1748].[3] Nor was Meeks required to have background knowledge of the coal industry. Meek's opinions are based on his experience as a geologist—not a coal industry professional.

Second, Plaintiffs contend that Meek's opinions are unreliable because he relied on "upon the results he obtained in his [Standard Penetration Testing ('SPT')] methodology" to the exclusion

---

[3] Even if it were, Plaintiffs admit that Meeks testified that he *did* have experience investigating coal mine subsidence, including "at least 5 such investigations in Kentucky," and Plaintiffs have offered no evidence to rebut Meek's testimony. [*Id.*].

of contrary evidence. [DE 38 at 1750]. As a result, Plaintiffs argue that his opinion is not the product of a reliable methodology that has been reliably applied to the facts of the case. This argument also fails.

As an initial matter, Plaintiffs' reliance on *Baker v. Blackhawk Mining, LLC*, 141 F.4th 760 (6th Cir. 2025) is misplaced. In *Baker*, the expert "analyzed mining effects on hydrologic systems not in" the "topographically unique" area that was the subject matter of the litigation, but in "nearby areas" that had not "experienced [the same] unprecedented rainfall." *Id.* at 770. In addition to failing to consider site-specific data, the expert failed to "provide any quantifiable or objectively testable model that is accepted by the relevant hydrologic engineering community." *Id.* at 770. Here, Plaintiffs do not dispute that Meeks conducted "SPT soil testing *at the Smith residence*." [DE 38 at 1735 (emphasis added)]. The same concern about the lack of case-specific data present in *Baker* is not implicated by Meek's analysis. Nor have Plaintiffs rebutted Meeks' testimony that the SPT methodology he employed is an industry-accepted "procedure to determine consistency of soils . . . to characterize material stiffness from the ground surface to a depth where it can't be advanced under just normal conditions." [DE 43-1 at 4907]. Rather, Plaintiffs argue that Meeks should have considered other data. [*See* DE 38 at 1751 (identifying "various contrary pieces of evidence indicating mine subsidence" which Meeks did not "confirm or consider")].

Plaintiffs' arguments relating to "contrary evidence" or "incompleteness" go to the weight of the evidence rather than its admissibility and are, therefore, properly rejected at this juncture. *United States v. Lang*, 717 F. App'x 523, 536 (6th Cir. 2017) (unpublished) ("Although Rule 702 does not require an expert to consider *all* the facts and data available, it does require the factual basis of his opinion to be *sufficient*."); *see also Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are

the traditional and appropriate means of attacking shaky but admissible evidence.") (citation modified); *Whirlpool Props. v. LG Elecs. U.S.A., Inc.*, No. 1:03 CV 414, 2006 WL 62846, at *4 (W.D. Mich. Jan. 10, 2006) ("Selection of an inappropriate universe generally affects the weight of the resulting data, not its admissibility.") (citation modified).

Contrary to Plaintiffs' assertions, the record shows that Meeks had a sufficient factual basis for his opinions. In addition to the results of the SPT analysis, Meeks conducted a "visual inspection" and put in an "open records request . . . for records pertaining to historical mining activities that potentially occurred beneath the property." [DE 38-4 at 2187–88]. Further, Meeks did consider whether there was a void beneath the Property. Meeks found that the AML maps indicated rooms and pillars but disputed "that that room had collapsed" [*id.* at 2209] based on the results of his SPT analysis. With respect to the "EXP1 core drilling data," which Plaintiffs assert was "clearly . . . indicative of coal mine subsidence," [DE 38 at 1752] Meeks had a reasonable basis to discount the accuracy of those samples to the extent that they contradicted his SPT analysis. Meeks stated the core samples appeared "discontinuous, not a uniformed section," and noted that the sampling process could cause the coal within the core samples to "fracture under its own nature." [DE 38-4 at 2195].

In sum, Plaintiffs' arguments amount to disagreement with Meeks' conclusions and go to the weight of his testimony, not its admissibility. Plaintiffs' motion to exclude Meeks [DE 38] is **DENIED**.

> ii.    Plaintiffs' Objections to Smith's Opinions

Plaintiffs' arguments for excluding Smith mirror their motion to exclude Meeks. According to Plaintiffs, "Smith's reports are inadmissible for three independent reasons":

> *First*, Mr. Smith is unqualified to offer his opinions in this case. *Second*, Mr. Smith's opinions necessarily require full and complete determination of the

21

existence of coal mine subsidence based solely on SPT soil analysis, without regard to other accepted testing techniques and/or methods to make that determination. This extraordinary analytical gap in his methodology invalidates each of his opinions. *Third*, Mr. Smith's primary opinion- that the Smith home is not damaged by coal mine subsidence, is unreliable and fails to address the 'specific practices' of this case.

[DE 39 at 2479].

ASIC responds that Plaintiffs have mischaracterized Smith's opinions, which were "confined to evaluating structural issues, while subsurface causation was addressed by his colleague . . . Meeks." [DE 42 at 4792 ("He evaluated whether and how the structure had moved or been damaged, and Meeks determined whether soil or subsurface movement, including mine subsidence, could account for that movement.")]. Thus, ASIC claims, Smith is not required to be "a mining engineer." [*Id.*].

Rule 702 asks merely whether the witness's background provides "a foundation for a witness to answer a specific question." *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994). A central issue in this case is not only whether mine subsidence occurred during the Policy period, but also whether soil movement caused the structural and surface-level damages to the Property. Smith's testimony concerns the latter issue, while he relies on Meeks' analysis to explain the cause of any observed soil movement on the Property. Indeed, Smith makes clear that while he and Meeks worked together to determine "there was movement, including movement of the foundation," he "did not determine the cause of soil movement. That was [Meeks'] purview." [DE 42-1 at 4856–57]. With this specific issue in mind, the Court turns to Smith's qualification.

Here, Smith is "a licensed professional engineer in Kentucky and multiple other states," with "16 years of engineering experience, the majority of which has been devoted to forensic structural engineering, including investigations involving subsidence-related damage." [DE 42 at 4792]. Based on his education and experience as a structural engineer, the Court finds Smith is

22

qualified to offer his opinions that the alleged damage was consistent with structural movement attributable to soil behavior identified by Meeks and other construction-related issues. Of course, to the extent that Smith seeks to opine on the accuracy of Meeks' conclusions, this testimony will be excluded. Plaintiffs' assertion that "Smith cannot testify as to the existence of coal mine subsidence when he relies upon another individual (Meeks) to make that determination" [DE 39 at 2484] is well taken.

However, the fact that Smith relies on Meeks' conclusions regarding subsurface conditions does not make Smith's methodology unreliable under Rule 702. Smith testified that it is standard practice in subsidence investigation to rely on geologists' findings in conjunction with visual inspections and analysis of other data, such as relative floor elevations, crack patterns, floor deflection, foundation behavior, and construction issues. [*See, e.g.,* DE 42-1 at 4818 (explaining that the geologist and engineer collaborate to "figure out if there is mine subsidence, to what extent it is causing damage to the structure"); *id.* at 4850 (explaining that the geologists' "SPT test alone does not dictate if the house experienced movement" but that it is considered "in conjunction with locations of cracks in the interior finishes and the foundation components," as well as "relative floor elevation measurements")]. Plaintiffs have failed to show that Smith's methodology is unreliable under Rule 702. Although Plaintiffs assert that Smith should have independently analyzed the geological data considered by Meeks, whether Smith's reliance on Meeks was reasonable is an appropriate issue for cross-examination.

Nor have Plaintiffs shown that Smith's conclusions were the result of an unreliable application of his methodology to the facts of the case. For instance, the fact that Smith did not return for a site visit after the damage to the Property worsened goes to the weight of his conclusions but does not make his opinion unreliable. Smith testified that NV5 was provided with

23

"photographs [that] were rather detailed, some of which were close up and contained tape measures in them," and "[t]here was nothing provided in the documents that indicated that we needed to visit the site an additional time." [DE 42-1 at 4875–76]. And Smith explained that worsening cracks were consistent with NV5's previous findings. [*Id.* at 4876]. To the extent that Plaintiffs argue that Smith was required to consider other information such as the "EXP1 core drilling data" or "Pillar Size and mine floor stability underneath the Smith home," Smith was entitled to rely on Meeks' opinions that this additional information from the AML investigation did not show mine subsidence was the cause of continuing soil movement. While Plaintiffs characterize "Smith's primary opinion" as the opinion "that the [Property] is not damaged by coal mine subsidence," [DE 39 at 2479], there is no indication in the record that Smith intends to offer his opinion on the cause of the observed soil movement, as opposed to the effects of such movement or other non-geological factors.

Accordingly, Plaintiffs' motion to exclude Smith [DE 39] is **DENIED**.

### B. ASIC'S Motion for Summary Judgment

ASIC moves for summary judgment on Plaintiffs' claims for breach of contract and bad faith. [DE 36].

### 1. Standard

Under Federal Rule Civil Procedure 56, summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986*)*. The essential inquiry is "whether the evidence presents a

sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52.

The movant has the initial burden to demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmovant, who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256 (discussing Fed. R. Civ. P. 56(e)). "The court must view the evidence in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Sagan v. United States*, 342 F.3d 493, 497 (6th Cir. 2003) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

Both parties must support their assertions "that a fact cannot be or is genuinely disputed" by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). Alternatively, either party can meet its burden by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(b).

It is not enough for the nonmovant to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.,* 475 U.S. at 586. Rather, the nonmovant must sufficiently allege a fact that, if proven, "would have [the] effect of establishing or refuting one of essential elements of a cause of action or defense asserted by the parties." *Midwest Media Prop., L.L.C. v. Symmes Twp., Ohio*, 503 F.3d 456, 469 (6th Cir. 2007) (alteration in original) (quoting *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (internal quotation marks omitted)). If

the nonmoving party does not respond with specific facts showing a genuine issue for trial, summary judgment is appropriate. *Emmons v. McLaughlin*, 874 F.2d 351, 353 (6th Cir. 1989).

### 1. Breach of Contract Claim

Plaintiffs allege that ASIC breached the Policy by failing to cover Plaintiffs' claim for damages caused by mine subsidence. Under Kentucky law, "there are three elements to a breach-of-contract claim: (1) existence of a contract; (2) breach of that contract; and (3) damages flowing from the breach of contract." *Arnold v. Liberty Mut. Ins. Co.*, 392 F. Supp. 3d 747, 774 (E.D. Ky. 2019). The parties agree that Kentucky law governs the interpretation of the Policy. [*See also* DE 9-1 ("This policy and any performance there under shall be construed with and governed by the laws of the State of Kentucky")]. "Interpretation of an insurance policy is a question of law" that the Court reviews de novo. *K.M.R. v. Foremost Ins. Group*, 171 S.W.3d 751, 753 (Ky. App. 2005). In undertaking review, the Court must keep in mind that a "contract should be liberally construed" and that all doubts must be "resolved in favor of the insureds." *Id.* Also, all "exceptions and exclusions should be strictly construed" for the efficacy of insurance. *Id.* "Under the 'doctrine of reasonable expectations,' an insured is entitled to all the coverage he may reasonably expect to be provided according to the terms of the policy." *Hendrix v. Fireman's Fund Ins. Co.*, 823 S.W.2d 937, 938 (Ky. Ct. App. 1991).

There is no dispute as to the existence of the Policy or that ASIC denied Plaintiffs' claim. Rather, ASIC claims that Plaintiffs' losses were not covered under the Policy and therefore it did not breach the contract.[4]

---

[4] In addition to disputing whether the losses were covered under the Policy, ASIC claims that it followed the procedures required by the Kentucky legislature when handling Plaintiffs' mine subsidence claim. [DE 36 at 475]. Plaintiffs do not contest this in their Response so the Court does not reach that issue here.

First, ASIC contends that the damages to the Property were due to "Earth Movement," not mine subsidence, and thus any losses are excluded under the Policy. [DE 36 at 477–79]. Next, even if mine subsidence were the cause of the damages to the Property, ASIC argues that other provisions apply to bar coverage—including exclusions "for faulty, inadequate, or defective design, repair, or construction" [DE 36 at 481] and for "Existing Damages" that Plaintiffs failed to disclose [*id.* at 482], as well as the "anti-concurrent causation clause" which ASIC argues "applies to extinguish coverage where one exclusion applies despite any concurrent cause that may otherwise be covered." [*Id.* at 484]. Lastly, ASIC claims it "should be relieved of its obligation to indemnify the plaintiffs under the precedent condition requiring the plaintiffs not to misrepresent or make false statements regarding any material fact or circumstance related to the insurance in their application." [*Id.* at 484].

As an initial matter, it is clear that a genuine dispute exists as to whether mine subsidence was the cause of the damages to the Property. As discussed above, Plaintiffs' causation expert will opine that mine subsidence occurred at the property and caused the damages to Plaintiffs' home. Moreover, there is sufficient documentary evidence from AML from which a reasonable jury could find the existence of mine subsidence. To the extent ASIC argues that the Court cannot consider the AML evidence at this stage of the proceedings because it constitutes hearsay, the Sixth Circuit has made clear that hearsay statements may be considered at the summary judgment stage, so long as the evidence can be offered in an admissible form at trial. *See Wyatt v. North America, Inc.*, 999 F.3d 400, 423, 424 n.8 (6th Cir. 2021); Fed. R. Civ. P. 56(c)(2). It appears that the AML statements would fall under the public records exception to the hearsay rule. *See* Fed. R. Evid. 803(8)(iii). Rule 803(8)(iii) provides, in pertinent part:

> (8) Public Records. A record or statement of a public office if . . . it sets out . . . (iii) in a civil case or against the government in a criminal case, factual findings from a

27

legally authorized investigation; and (B) the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness.

*Id.* When viewed in a light most favorable to Plaintiffs, the AML documents outlining the "Gwen Smith Subsidence AML Reclamation Project" [DE 44-6], taken together with the fact that AML approved and expended approximately $1.8 million to remediate the Property, [DE 44 at 4971], are facts from which a reasonable jury could infer that AML determined that the Property was damaged by mine subsidence. Accordingly, exclusions for causes other than mine subsidence cannot entitle ASIC to judgment as a matter of law. Plaintiffs' breach of contract claims survive summary judgment unless ASIC has met its burden to show that other provisions of the Policy barred coverage.

Next, ASIC argues that the ABS inspection report Plaintiffs acquired prior to purchasing the Property "provides irrefutable proof that the damages to the plaintiffs' home both began prior to the plaintiffs' purchase of the home in 2017 and were likely caused by 'significant deficiencies and maintenance items that need[ed] further evaluation or repair by appropriately Licensed Contractors.'" [DE 36 at 481]. ASIC is partially correct. While Plaintiffs' expert will dispute that the losses were caused by "faulty, inadequate, or defective design, repair, or construction of the [Property]," [*id.*], the ABS inspection report and other record evidence show that the damages to the Property began occurring before Plaintiffs purchased the property and well before the Policy period. Indeed, Plaintiffs assert that "the Smiths, their expert, and most persuasively AML document continuing coal mine subsidence *from the time the Smiths bought their home in 2017.*" [DE 44 at 4993 (emphasis added)].

As a result, a substantial portion of Plaintiffs' losses are likely excluded under the Policy. Relevant here, under the "Existing Damages" exclusion, the Policy states that ASIC "do[es] not cover:"

28

> 1. Damages which occurred prior to policy inception regardless of whether such damages were apparent at the time of the inception of this policy or discovered at a later date; or
>
> 2. Claims or damages arising out of workmanship, repairs or lack of repairs arising from damage which occurred prior to policy inception.

[DE 9-1 at 175]. Nevertheless, ASIC does not argue that all the damages occurred prior to the Policy period—nor could it, as both parties agree "the same kind of damages. . . are still occurring today." [DE 36 at 484]. Rather, ASIC argues that the "Existing Damages" exclusion applies in conjunction with the "anti-concurrent causation clause" because "the damages had begun to occur years before the inception of the ASIC Policy in July 2020." [*Id.*].

ASIC's interpretation of the Policy is untenable in light of the requirement under Kentucky law that exclusions be narrowly construed and that all questions should be resolved in favor of coverage. Here, the "Existing Damages" exclusion does not clearly exclude damages whose causes may have predated the Policy but which are ongoing during the Policy period. A reasonable interpretation—if not the most reasonable one—is that the provision was intended to exclude only losses which "occurred prior" to policy inception. In comparison, in cases where courts have excluded ongoing damages during the policy period, the policy has explicitly excluded damages which "begin" prior to the inception date. *See, e.g., James River Cas. Co. v. UniControl, Inc.*, No. 22-3721, 2023 WL 4543487, at *3 (6th Cir. July 14, 2023) (finding "Subsection (a) explicitly states that coverage does not extend to property damage that 'begins or takes place before the inception date of coverage.'"). And "[w]here an exclusion is susceptible to two reasonable interpretations, the interpretation favorable to the insured is adopted." *St. Paul Fire & Marine Ins. Co. v. Powell-Walton-Milward, Inc.*, 870 S.W.2d 223, 226 (Ky. 1994).

Accordingly, the Policy does not exclude damages from mine subsidence occurring during the Policy period. The anti-concurrent causation clause only applies when losses are "caused

29

directly or indirectly" by an excluded loss, "regardless of any other cause or event contributing concurrently or in any sequence to the loss." [DE 9-1 at 173]. But this provision does not entitle ASIC to summary judgment because there is at least a dispute of fact as to whether Plaintiffs losses were due to ongoing mine subsidence during the Policy period or due to subsidence that had already taken place. Only if the damages were "caused directly or indirectly" by the pre-existing losses would the anti-concurrent causation clause bar coverage. [*Id. Cf. Blankenship v. State Farm Fire & Cas. Co.*, No. CV 21-7-DLB-EBA, 2023 WL 2637358, at \*6 (E.D. Ky. Mar. 24, 2023) ("[T]he crucial question . . . is whether a genuine issue of material fact exists as to the *cause* of the damage."). Apportioning the damages from mine subsidence that occurred prior to the Policy inception and the damages from mine subsidence that occurred during the Policy period presents a question of fact properly reserved for the jury.

To resist this conclusion, ASIC asks the Court to adopt the "known loss" or "loss in progress" doctrine. [DE 49 at 7540]. According to ASIC, "[u]nder the 'loss in progress' rule, if the insured is aware that a loss is already in progress when a policy is issued, the insurer will not be required to provide coverage with respect to that loss." [*Id.* (collecting cases)]. Although not relied upon by ASIC, this Court has previously found the loss-in-progress doctrine applied under Kentucky law:

> No Kentucky case has expressly spoken on the "loss-in-progress doctrine." However, the Supreme Court of Kentucky recently reaffirmed a related doctrine, the principle of fortuity in *Aetna Cas. & Sur. Co. v. Commonwealth*, 179 S.W.3d 830 (Ky. 2005). The principle of fortuity and the loss-in-progress doctrine are variations of the same basic concept. *See National Union Fire Insurance Company of Pittsburgh, Pa. v. The Stroh Companies, Inc.*, 265 F.3d 97, 106 (2d Cir. 2001) (discussing fortuity and loss-in-progress). The fortuity principle, like the loss-in-progress doctrine, presumes that the purpose of insurance is to spread risk; therefore, where the insured intentionally or willfully causes the loss at issue, the loss is uninsurable. . . . Based on the Kentucky Supreme Court's recent discussion of the fortuity doctrine and the Sixth Circuit's persuasive authority, this Court today

30

likewise concludes that the Kentucky Supreme Court would adopt the loss-in-progress doctrine.

*Pizza Magia Int'l, LLC v. Assurance Co. of Am.*, 447 F. Supp. 2d 766, 775 (W.D. Ky. 2006). Consistent with *Pizza Magia,* this Court will apply the same standard articulated in *Inland Waters Pollution Control, Inc. v. Nat'l Union Fire Ins. Co.*, 997 F.2d 172, 179 (6th Cir. 1993), where "the Sixth Circuit held that the loss-in-progress doctrine precludes coverage where 'the insured is aware of a threat of loss so immediate that it might fairly be said that the loss was in progress and that the insured knew it at the time the policy was issued or applied for.'" *Pizza Magia Int'l, LLC*, 447 F. Supp. 2d at 776 (quoting *Inland Waters*, 997 F.2d at 178).

In this case, the issue is whether Plaintiffs were aware that the losses due to mine subsidence would continue during the Policy period. A reasonable jury could go either way. The record contains evidence that from which a jury could find that the Plaintiffs were aware of ongoing losses and that such losses were due to mine subsidence because they filed a mine subsidence claim with KFB, their previous insurer. However, KFB hired Bowser-Morner, who concluded that "the primary cause and origin of the damages presently occurring in the residence is natural soil movement due to conditions present at the site affecting the footings and foundation walls of the house." [DE 36 at 461]. Accordingly, a reasonable jury could also conclude that Plaintiffs were unaware at the time the Police was issued that mine subsidence would continue to cause damages to the Property. Summary judgment on this issue is therefore inappropriate.

Lastly, ASIC argues that Plaintiffs' claim with KFB establishes an independent bar to coverage, because Plaintiffs' broker failed to disclose this claim when applying to ASIC for a new Policy. In relevant part, the "Conditions" section of the Policy states that ASIC will provide no coverage

if, whether before or after a loss, any 'insured' has:

31

      1. Concealed or misrepresented any material fact or circumstance;

      2. Engaged in fraudulent conduct; or

      3. Made false statements;

      relating to this insurance.

[*Id.* at 179 (provision titled "Concealment or Fraud")].

Here, there is no dispute that when asked for the "[n]umber of paid or unpaid non-weather property claims you have reported in the past 5 years," Plaintiffs' (through their broker) reported "0." [DE 36-11 at 733]. On the other hand, Plaintiffs did report "1" "paid or unpaid weather property claims." [*Id.*]. The record is unclear which claim Plaintiffs were referring to and, unfortunately, Plaintiffs failed to address this argument in their Response. Even so, ASIC has not shown that the "Concealment or Fraud" provision bars coverage as a matter of law. As noted by ASIC, "[i]n her deposition, Gwen Smith . . . denied the claim she filed with KFB was for mine subsidence because she did not know what was causing the damages." [DE 36 at 483 n.8]. Although ASIC characterizes this statement as a "self-serving contention" and notes that it is contradicted by other evidence in the record, [*id.* (noting KFB claim file stated call was for "possible mine subsidence")], discounting this testimony requires making a credibility determination and therefore is an issue for the jury.

Accordingly, ASIC has not met its burden on Plaintiffs' breach of contract claims.

### 2. *Bad Faith Claims*

To prevail on their bad faith claims under either the common law or the UCSPA, Plaintiffs must establish that ASIC was obligated to pay their mine subsidence claim under the terms of the Policy; that ASIC lacked a reasonable basis in law or in fact for denying the claim; and that ASIC either knew there was no reasonable basis for denying the claim or acted with reckless disregard. *Wittmer v. Jones*, 864 S.W.2d 885 (Ky. 1993). *Accord Shaheen v. Progressive Cas. Ins. Co.*, 673

F. App'x 481, 485 (6th Cir. 2016). "Liability for bad faith will arise only in those instances where an insurer acts with some degree of conscious wrongdoing, reckless or in a manner which reveals an unjustified gamble at the stake of the insured." *Matt v. Liberty Mut. Ins. Co.*, 798 F.Supp. 429, 434 (W.D.Ky. 1991), *aff'd*, 968 F.2d 1215 (6th Cir. 1992).

The Court has already determined that there is a factual dispute as to whether ASIC is obligated to pay the mine subsidence claim under the terms of the Policy. Therefore, ASIC must show that no reasonable jury could find for Plaintiffs on the second or third *Wittmer* elements.

As to the second element, Plaintiffs do not dispute that ASIC substantially followed all internal and statutory procedures for processing Plaintiffs' claim for mine subsidence. Shortly after receiving the first notice of loss, ASIC's claims adjuster spoke with Plaintiffs and promptly began investigating the claim. [*See* DE 36 at 488]. ASIC engaged Lighthouse Claims to document the damages and NV5 to determine the cause of the losses and kept Plaintiffs updated throughout the process. [*Id.*]. ASIC received NV5's determination that the losses were due to soil movement rather than mine subsidence on June 30, 2021 and notified Plaintiffs of the adverse coverage determination on July 5, 2021. [*Id.* at 489]. Then, after Plaintiffs requested that ASIC reopen the claim based on additional information from the AML, ASIC again engaged Lighthouse Claims and NV5 to reinvestigate the claim in light of the additional information. [*Id.*]. Once again, NV5 determined that mine subsidence was not the cause of the losses. [*Id.*].

Plaintiffs assert that ASIC's reliance on NV5's determination was unreasonable because

> [t]he Commonwealth of Kentucky spent an exorbitant amount of time and money to remediate the land under the Smiths' home and yet ASIC still denied the claim . . . rel[ying] only on NV5's report and the previous insurer, KFB's report completely rejecting the AML findings and project. It disregarded AML which was the most persuasive authority.

33

[DE 44 at 4998]. According to Plaintiffs, ASIC failed to take any "discovery whatsoever from any Kentucky personnel within AML or the Department of Mines and Minerals to attempt to confirm . . . the position of the Commonwealth of Kentucky that the Smith home was damaged by mine subsidence. Nothing." [*Id.*].

Plaintiffs' critique of ASIC's investigation is misplaced and unsupported by the record. It is undisputed that the NV5 investigators issued open records requests to AML to investigate the new materials, including "additional information on the boring logs" AML conducted on the Property. [DE 36-29 at 1088]. Indeed, the NV5 report identifies all the additional information reviewed, including the open records of AML. [DE 6-1 at 85]. NV5 addressed the existence of voids below the home but determined that there was no indication of "downward raveling or collapse." [DE 6-1 at 87]. *Farmland Mut. Ins. Co. v. Johnson*, 36 S.W.3d 368 (Ky. 2000), is therefore inapposite because here there is no evidence that the investigators ignored AML's findings. The fact that AML expended a large amount of capital to remediate the Property does not make ASIC's reliance on NV5's determination unreasonable. Nor have Plaintiffs explained why ASIC was required to take interview specific individuals at "AML or the Department of Mines and Minerals." [DE 44 at 4998]. Even if they had, ASIC's claim records shows that ASIC did contact AML to discuss their findings. [*See* DE 36-29 at 1090]. ASIC contacted Bob Scott, the branch manager at AML, who "indicated that they could not confirm mine subsidence, [but that] they decided to start remediating the land." [*Id.*]. In sum, Plaintiffs have failed to produce any evidence from which a jury could find that ASIC lacked a reasonable basis in law or in fact for denying the claim. *Wittmer,* 864 S.W.2d 885.

Finally, even if Plaintiffs had met their burden under the second *Wittmer* element, Plaintiffs have failed to meet their burden to show "intentional misconduct or reckless disregard

34

of the rights of an insured or claimant to warrant submitting the right to award punitive damages to the jury." *Wittmer*, 864 S.W.2d at 890. Plaintiffs' sole argument is that the AML "budgeted nearly $1,800,000 of taxpayer money" to remediate the Property. Yet AML's decision to expend resources on the Property says nothing about ASIC's intention when denying the claim, particularly where, as here, ASIC conducted a thorough investigation of AML's investigation records.

Accordingly, Plaintiffs' bad faith claims fail as a matter of law and ASIC's motion for summary judgment [DE 36] is **GRANTED in part and DENIED in part**, consistent with this opinion.

### III.    CONCLUSION

Having thus considered the parties' filings and the applicable law, and being otherwise sufficiently advised, the Court **ORDERS:**

1.    ASIC's motion to exclude the proposed opinion testimony of Gaston and Garrigan [DE 37] is **DENIED**;

2.    Plaintiffs' motions to exclude the testimony of Meeks [DE 38] is **DENIED**;

3.    Plaintiffs' motions to exclude the testimony of Smith [DE 39] is **DENIED**;

4.    ASIC's Motion for Summary Judgment [DE 36] is **GRANTED in part** as to Count II, Violations of the Kentucky Unfair Claims Settlement Practices Act, Count III, Common Law Bad Faith, and Count V, Violations of Ky. Rev. § Stat. 304.12-235; and

5.    ASIC's Motion for Summary Judgment [DE 36] is **DENIED in part** as to Count I, Breach of Contract.

June 18, 2026

35

Rebecca Grady Jennings, District Judge

United States District Court